Filed 11/22/24  P. v. Ramirez CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PABLO EDUARDO RAMIREZ,<br><br>    Defendant and Appellant. | D082858<br><br><br>(Super. Ct. No. SCE408608) |

APPEAL from a judgment of the Superior Court of San Diego County, Daniel G. Lamborn, Judge.  Affirmed.

Elizabeth Campbell, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and Arlyn Escalante, Deputy Attorneys General for Plaintiff and Respondent.

Pablo Eduardo Ramirez attempted to murder his girlfriend in front of the couple's seven- and three-year-old children, and attempted to murder his

two stepdaughters, ages eleven and fifteen, while they slept in their beds.  He shot his girlfriend in the neck and back, and shot fifteen-year-old R.M. in the arm and back, severing her spinal cord and leaving her paralyzed from the chest down.  Eleven-year-old S.M. escaped as Ramirez shot at her bed and she ran from the house to find help.  First responders found Ramirez's girlfriend and R.M. lying in pools of blood crying desperately for help and unable to move.  A jury found appellant guilty of three counts of attempted first degree murder.

On appeal from the judgment of conviction, Ramirez argues the trial court abused its discretion and applied the wrong legal standard under Penal Code section 1385, subdivision (c)[1] when it declined to dismiss multiple firearm enhancements and a prior strike enhancement.  The Attorney General responds that the court applied the correct standard, and properly understood and exercised its discretion in declining to dismiss the enhancements.  As we shall explain, we agree with the Attorney General and affirm the judgment of conviction.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Trial*

Ramirez and his girlfriend, N.O., began dating in 2012 and moved in together shortly after.  N.O.'s daughters, R.M. and S.M., were from a prior relationship.  Ramirez also had an adult son with special needs from a prior relationship.  After moving in together, Ramirez and N.O. had two children, P.R., born in 2014, and L.R., born in 2018.  Ramirez, N.O., and the five children all lived in Ramirez's home in Lemon Grove.

At trial, N.O. described her relationship with Ramirez before their children were born as "pretty toxic."  N.O. told the jury that Ramirez often

---

[1]    Subsequent undesignated statutory references are to the Penal Code.

kicked her and her two daughters out of the house, throwing their belongings out. They argued, reconciled, and then the cycle would repeat. N.O. said that Ramirez had once punched her in the eye, but she did not report the incident. Shortly after they moved in together, N.O. learned Ramirez had a gun in the home. A few years before the underlying crimes, after an argument, N.O. threatened to report Ramirez for having the gun unlawfully. In response, Ramirez told her he had removed the gun from the house.

N.O. testified that after their shared children were born, their relationship improved. However, by 2021, the couple's frequent arguments resumed. N.O. felt that Ramirez treated her daughters differently than the couple's shared children. Ramirez accused R.M. and S.M. of bullying the younger children. According to N.O., Ramirez tried to ostracize R.M. and S.M. from the rest of the family and often called them names like "pieces of shit."

On September 3, 2021, Ramirez and N.O. got into an argument after he acted aggressively towards 11-year-old S.M. Ramirez thought that S.M. had told three-year-old L.R. that she did not like L.R. S.M. told the jury that during this incident Ramirez raised a fist at her as if he might strike. After the couple's fight about that interaction between Ramirez and S.M, Ramirez and N.O. did not speak for several days and the atmosphere in the house became very tense.

N.O. testified that in the evenings, Ramirez often left the house by himself and would drink alcohol and smoke marijuana alone for hours before returning home. In the evening on September 8, 2021, N.O. was filling out child support paperwork for R.M. and S.M.'s father. Ramirez asked if the paperwork was for him, and N.O. responded, "Not yet, but you're next." Ramirez then left the house around 8 p.m., as he often did, to go out to drink.

3

Ramirez walked to a nearby liquor store and bought two cans of Mike's Harder Lemonade and three shots of 99 Bananas, which he then took to a park to consume.

After Ramirez left the house, N.O. went to bed. She woke up in the middle of the night when she heard Ramirez looking for something in the couple's bedroom dresser, where they kept a key for a trailer in the backyard. The couple's three-year-old child was asleep in the bed with N.O. and their seven-year-old child was sleeping in a crib nearby. N.O. pretended to stay asleep, and thought that Ramirez left the room after he saw her stir. N.O. got up to use the bathroom and heard Ramirez pacing outside the bedroom.

N.O. then saw Ramirez go outside to the trailer. She was standing near the bed when Ramirez came back inside holding a gun. Ramirez pointed the weapon at N.O.'s face. She grabbed L.R. from the bed, hoping this would prevent Ramirez from firing the gun at her. As she moved for the child, Ramirez shot N.O. in the back of the neck. N.O. fell to the ground. As she laid on the floor in a pool of blood, with L.R. nearby, Ramirez said something to the effect of, "Where's your uncle now, bitch?"[2] N.O. then saw Ramirez go into R.M. and S.M.'s shared bedroom and heard him say, "who's next" or "you're next."

R.M. woke when Ramirez opened the door to her room. She heard Ramirez say, "where's your uncle now" and, "you know who is next." She saw Ramirez standing by the door and thought he looked like he was prepared to shoot her. As she moved to get out of bed, she saw a spark from the gun; a bullet had hit her elbow. R.M. got out of bed and ran to the backdoor of the

---

[2] N.O. explained that her uncle was a gang member, was protective of her, and that Ramirez and her uncle had disagreements in the past. Ramirez also knew members of a gang that was a rival to N.O.'s uncle's gang.

house to escape.  She tried to open the door, but the lock was jammed. Ramirez then shot R.M. in the back near her left shoulder as she struggled to open the door.

S.M. woke up when she heard gunshots and her mother screaming. She got out of bed and saw Ramirez opening the door to her bedroom.  She heard Ramirez say, "you know who's next."  S.M. then saw Ramirez shoot at R.M.'s bed, at the middle of the room, and then at her own bed.  S.M. thought she had been shot because her eyes and arm started to burn from the gun's sparks.  S.M. then ran toward the front door, found she could not open it, ran back towards N.O. and Ramirez's bedroom where she saw her mother on the floor bleeding, and ran back towards her own room where she saw R.M. on the floor bleeding.  S.M. then slipped on her sister's blood but managed to get out of the back door.  S.M. jumped the fence in the backyard and went to a neighbor's house for help.  Before she reached the neighbor's house, S.M. heard another gunshot and ducked because she thought Ramirez was shooting at her.  Once she reached her neighbor's home and was taken inside, the neighbor called 911.

As the girls were being attacked by Ramirez, N.O. managed to pull herself up, get her phone from the bed, and call 911.  She felt like she could not breathe and that she was choking on her own blood.  N.O. saw blood everywhere.  N.O. also heard a loud sound coming from the other room and one of her daughters asking for help.  She thought that only one of her girls was alive.  L.R. was still next to N.O. as she was bleeding out, so N.O. called to Ramirez to get L.R. out of the room so the child would not see her die. Ramirez calmly took L.R. by the hand and led the child out of the room.

First responders reached the house and N.O. and R.M. were taken to the hospital in ambulances. Ramirez exited the home holding L.R. and was taken into custody.

N.O. lost consciousness in the ambulance and woke up a week later in the intensive care unit of the hospital. A bullet had lacerated her kidney, liver, and lungs, and broken three ribs. She also sustained a neck wound that took over six months to heal. At the time of trial in 2023, N.O. remained in considerable physical pain.

R.M. also lost consciousness after law enforcement arrived. She remained in the hospital for 10 months and was paralyzed from the chest down. R.M., who was left-handed, also had her left arm fused straight and permanently lost the use of that arm and hand. By the time of trial, R.M. was learning to use her right hand, but could not eat, dress, or use the bathroom on her own.

Ramirez testified in his own defense. He told the jury he had been the victim of violence and as a young man had witnessed a friend get shot. Ramirez also told the jury he had life-long problems with alcohol abuse and that he was intoxicated at the time of the crimes. He testified he did not remember shooting the gun, he did not intend to kill anyone, and he had no recollection of what his thoughts were during the shooting. During cross-examination, Ramirez was confronted with statements he made to a forensic psychologist hired by the defense to evaluate him for trial. He admitted telling the psychologist that he was pushed over the edge and he remembered retrieving his gun and shooting at N.O. and her daughters.

Several character witnesses testified in support of Ramirez that they did not think he was capable of the crimes and he had been a loving caretaker for his disabled son. Ramirez's sister testified that N.O. belittled

6

Ramirez and disrespected him. A neighbor and a caretaker who worked with Ramirez's son also testified that they had witnessed N.O. talking to Ramirez in a demeaning way. A social worker assigned to Ramirez's son testified that at her annual meeting with Ramirez, he told her he was having frequent conflict with N.O. and spoke about getting a restraining order against N.O. and evicting her from his house.

The defense also called Dr. Kristina Malek, the psychologist hired to examine Ramirez. Dr. Malek testified about triggers that may have contributed to Ramirez "snapping" on the night of the attempted murders. Dr. Malek diagnosed Ramirez with severe alcohol use disorder, severe cannabis use disorder, post-traumatic stress disorder, and unspecified depressive disorder.

After the conclusion of the evidence and closing statements, the jury returned its verdict finding Ramirez guilty of three counts of first degree attempted murder (§§ 664 and 187, subd. (a)). The jury also found true several enhancement allegations for great bodily injury with the use of a firearm and domestic violence. (§§ 12022.53, subd. (d), and 12022.7, subd. (e), for count 1 (N.O.); §§ 12022.53, subd. (d), and 12022.7, subd. (b), for count 2 (R.M.); and § 12022.53, subd. (d), for count 3 (S.M.)). In addition, prior to trial, Ramirez pled guilty to possession of firearm by a felon (§ 29800, subd. (a)(1), count 4) and admitted a prior strike conviction.

B. *Sentencing*

Before sentencing, Ramirez submitted a brief asking the trial court to dismiss his prior strike conviction and the enhancements the jury found true under section 1385, subdivision (c). Ramirez also raised various factors in mitigation and asked the court to run his three attempted murder sentences concurrently rather than consecutively. The District Attorney also submitted

a sentencing brief.  The People urged the court not to dismiss the prior strike conviction, his "nickel prior" convictions, and the gun enhancements.  The People also sought consecutive terms on the attempted murder convictions.

At the sentencing hearing, the court heard victim impact statements from S.M. and R.M. and statements from three of Ramirez's family members. The trial court then heard argument from the District Attorney, who highlighted Ramirez's lack of remorse and accountability for his actions, and asserted that the mitigating factors identified by Ramirez did not weigh in favor of striking his priors.  The District Attorney also asserted that if Ramirez were to be released at 70 or 80 years old, he would still pose a danger to the community given his horrific actions and his willingness to violate the law.

Ramirez's counsel argued that the court should strike Ramirez's strike prior felony conviction under *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) because it was over 25 years old, he entered a guilty plea early, and he was not sentenced to prison for the conviction.  Defense counsel asserted Ramirez had lived a crime-free life from that conviction to the present crimes.  Counsel also pointed to mitigating factors to support his request to strike the prior strike conviction, including Ramirez's military service, his difficulties with alcohol abuse, and his struggle as a single father taking care of a disabled son.

Ramirez's counsel argued the court should dismiss the enhancements under section 1385, subdivision (c), because there were multiple enhancements, which would result in a sentence of over 20 years.  He also argued the court should consider evidence showing the crimes were connected to his mental illness and past trauma, including prior suicidal thoughts, paranoia and reactiveness, and heavy drinking on the night of the crimes.

8

Defense counsel pointed to the trial testimony of Dr. Malek about the effects of Ramirez's prior trauma and how it likely led Ramirez to snap on the night of the attempted murders.

Lastly, Ramirez's counsel asked the court to impose the attempted murder terms concurrently because they were all part of the same course of conduct, happening within a few feet and seconds of each other. Defense counsel argued Ramirez's actions were not part of a preconceived plan but were a consequence "of an irrational rage and alcohol-fueled snapping."

The court denied Ramirez's *Romero* motion and, on counts 1, 2 and 3, sentenced Ramirez to consecutive terms of 14 years to life, consisting of the middle term doubled for the prior strike. On counts 1 (N.O.) and 2 (R.M.), the trial court sentenced Ramirez to consecutive terms of 25 years to life for the great bodily injury with use of a firearm enhancements (§ 12022.53, subd. (d)), and stayed the sentences for the great bodily injury as a result of domestic violence enhancement on count 1 (§ 12022.7, subd. (e)) and the great bodily injury resulting in paralysis enhancement on count 2 (§ 12022.7, subd. (b)). On count 3 (S.M.), the trial court sentenced Ramirez to a consecutive sentence of 20 years for a lesser included gun enhancement under section 12022.53, subdivision (c). On count 4, the trial court sentenced Ramirez to a consecutive 4 years for possessing a firearm as a felon. The court imposed a total prison term of 24 years plus 92 years to life.

The court did strike Ramirez's nickel prior for all three counts. In explaining its decision to impose the 25-year term under section 12022.53, subdivision (d) for count 1, the court stated that it "considered the facts of the present case and all the submissions of both parties … the dictates of [section] 1385(c)(3) … [gave] great weight to the evidence provided by the defense … and underst[ood] that proof of one or more of the factors weighs

9

greatly in favor of dismissing the enhancement." The court stated it considered Dr. Malek's testimony, Ramirez's victimization, trauma, and past experiences. The court also noted that "the jury was not persuaded by Dr. Malek's testimony." The court found there was no connection between Ramirez's past experiences and the "methodical attempted murder of the victims in this case." Further, the court found Ramirez's "prior experiences did not substantially contribute to the crimes ... which were the result of a consideration of perceived slights or offenses to [Ramirez] by [N.O.] in his decision to kill her and her daughters."

The trial court also stated it had "considered the mental illnesses of [Ramirez] as testified to by Dr. Malek," including his "depression, paranoia, anxiety, and substance abuse … [and the] defense argu[ment] that these factors led [Ramirez] to snap into an uncontrolled rage." The trial court noted, "The jury did not agree with this characterization, and I don't either." The court found Ramirez's actions "showed a clear and logical thinking … his behavior while engaged in the preparation and execution of the attempt[ed] murders were all clear and goal-oriented." The court found Ramirez's "mental illnesses did not substantially contribute to the commission of the crimes."

The court also found dismissal of the enhancements under section 1385, subdivision (c) was not appropriate because an early release from custody would present a danger to others. The court explained: "Based on little or moderate provocation, the defendant determined not only to kill his wife, but also her two innocent daughters …. He had for years, in violation of law, kept firearms at his disposal. After leaving the house of bloodied bodies, some of which will have life-long injuries, his only thought

10

was to empty his bank accounts, shut down the utilities, and remove the washer and dryer."[3]

For the section 12022.53, subdivision (d) enhancement on count 2 (R.M.), the court stated its reasoning was the same as that for count 1. On count 3 (S.M.), the court also stated its reasoning to not dismiss the enhancement was the same, but the court exercised its discretion to impose punishment under the lesser included section 12022.53, subdivision (c) enhancement, sentencing Ramirez to a 20 years to life and not 25 years to life.

Ramirez timely appealed from the judgment of conviction.

DISCUSSION

As stated, Ramirez argues the trial court did not invoke the proper standard in its decision to deny his request to dismiss the enhancements and his prior strike conviction. He contends that because the trial court referred to the jury's rejection of his defense that the crimes were the result of provocation by N.O., his past trauma, mental illness, and alcohol abuse, the court did not adequately consider the mitigating factors set forth in section 1385, subdivision (c). Ramirez also argues that even if the court

---

[3]     The probation report submitted for sentencing stated that after his arrest, Ramirez called his sister from jail and instructed her to disconnect the internet, cable, phone, water, gas, and electricity for the family home and to remove the washer and dryer. The report also states that Ramirez told his sister to find a good eviction lawyer and that his sister emptied all of Ramirez's bank accounts to prevent N.O. and her daughters from having access to his money. In addition, the probation officer reported that when he asked Ramirez if he had anything else he wanted the court to know or consider for sentencing he was not remorseful, but instead complained that the court and his trial counsel had prevented him from introducing additional evidence concerning N.O.'s provocative behavior prior to the shooting.

11

employed the proper standard, its decision not to strike the enhancements and the prior strike was an abuse of discretion.

I

*Legal Standards*

Effective January 1, 2022, Senate Bill No. 81 amended section 1385 to include subdivision (c).  (*People v. Mendoza* (2023) 88 Cal.App.5th 287, 295 (*Mendoza*).)  Section 1385, subdivision (c)(1) provides that, "[n]otwithstanding any other law, the court shall dismiss an enhancement if it is in the furtherance of justice to do so."  (§ 1385, subd. (c)(1); see also Cal. Rules of Court, rule 4.428(c)(1).)  Section 1385, subdivision (c)(2) additionally provides: "In exercising its discretion under this subdivision, the court shall consider and afford great weight to evidence offered by the defendant to prove that any of the mitigating circumstances in subparagraphs (A) to (I) are present."  (See also Cal. Rules of Court, rule 4.428(c)(2).)  Such mitigating circumstances include where multiple enhancements are alleged, the application of an enhancement could result in a sentence over 20 years, the current offense is connected to mental illness, and the current offense is connected to prior victimization or childhood trauma.  (§ 1385, subd. (c)(2)(A)–(I).)

"Proof of the presence of one or more of these circumstances weighs greatly in favor of dismissing the enhancement, unless the court finds that dismissal of the enhancement would endanger public safety."  (§ 1385, subd. (c)(2); see also Cal. Rules of Court, rule 4.428(c)(2)(A) and *People v. Walker* (2024) 16 Cal.5th 1024, 1033 [" 'if the trial court finds that dismissal of an enhancement would endanger public safety, then it is hard to see how dismissal would further the interests of justice,' notwithstanding the applicability of any mitigating factors identified in subdivision (c)(2)"].)

" 'Endanger public safety' means there is a likelihood that the dismissal of the enhancement would result in physical injury or other serious danger to others.' " (§ 1385, subd. (c)(2); see also Cal. Rules of Court, rule 4.428(c)(2)(C).)

Section 1385, subdivision (c)(5), further provides that: "a mental illness is a mental disorder as identified in the most recent edition of the Diagnostic and Statistical Manual of Mental Disorders, including, but not limited to, bipolar disorder, schizophrenia, schizoaffective disorder, or post-traumatic stress disorder but excluding antisocial personality disorder, borderline personality disorder, and pedophilia. A court may conclude that a defendant's mental illness was connected to the offense if, after reviewing any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, statements by the defendant's mental health treatment provider, medical records, records or reports by qualified medical experts, or evidence that the defendant displayed symptoms consistent with the relevant mental disorder at or near the time of the offense, the court concludes that the defendant's mental illness substantially contributed to the defendant's involvement in the commission of the offense."

The statute also states that " '[p]rior victimization' means the person was a victim of intimate partner violence, sexual violence, or human trafficking, or the person has experienced psychological or physical trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence. A court may conclude that a defendant's prior victimization was connected to the offense if, after reviewing any relevant and credible evidence, including, but not limited to, police reports, preliminary hearing transcripts, witness statements, medical records, or records or reports by qualified medical

13

experts, the court concludes that the defendant's prior victimization substantially contributed to the defendant's involvement in the commission of the offense." (§ 1385, subd. (c)(6)(B).)

An appellate court reviews a trial court's decision not to dismiss an enhancement in the furtherance of justice for an abuse of discretion. (*Mendoza, supra*, 88 Cal.App.5th at p. 298.) That standard also applies to a trial court's determination that dismissing an enhancement would endanger public safety. (*Ibid.*) The standard "is highly deferential. When, ' "as here, a discretionary power is statutorily vested in the trial court, its exercise of that discretion 'must not be disturbed on appeal *except* on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice.' " ' " (*Ibid.*) Further, " ' " "[t]he burden is on the party attacking the sentence to clearly show that the sentencing decision was irrational or arbitrary. [Citation.] In the absence of such a showing, the trial court is presumed to have acted to achieve legitimate sentencing objectives, and its discretionary determination to impose a particular sentence will not be set aside on review.' " ' " (*People v. Pearson* (2019) 38 Cal.App.5th 112, 116.)

II

*Analysis*

The record in this case makes clear that the court carefully employed the proper standard in determining whether to strike enhancements under section 1385, subdivision (c). In addition, Ramirez has not established that the court abused its discretion in denying his requests to dismiss the enhancements and prior strike.

As the Attorney General points out, the court explicitly stated that in making its sentencing decisions it considered "all the evidence presented at

14

the trial including pretrial motions, as well as the probation report, the sentencing statements of both the People and [defense] with attachments and letters in support of [Ramirez.]" The trial testimony included Dr. Malek's opinions that Ramirez suffered from post-traumatic stress disorder and unspecified depressive disorder, as well as Ramirez's own extensive testimony about his past traumas, mental health issues, and alcohol abuse. The probation report also contained information about Ramirez's history of depression and alcohol abuse. After considering this evidence, the trial court found Ramirez had not shown that his mental illness or prior victimization substantially contributed to the attempted murders.

Further, the trial court did not, as Ramirez asserts on appeal, base its decision on the jury's findings at trial. Rather, the court noted that the jury had also not believed Ramirez "snapping" or heat of passion argument when it found him guilty of attempted first degree murder rather than a lesser offense. The trial court's reference to the jury's findings does not invalidate the court's consideration of the mitigating evidence offered by Ramirez in determining dismissal of the enhancements was not warranted. (See *People v. Williams* (1997) 16 Cal.4th 153, 281–282 [Rejecting defendant's claim that trial court failed to follow the law "[b]ased solely on" an isolated remark and instead explaining that the trial court's "full remarks" must be considered.].) Rather, the trial court's full remarks show it made its decision after careful consideration of all the relevant factors under section 1385, subdivision (c).

Ramirez also asserts the trial court did not understand the scope of its discretion. The record shows the opposite. The trial court thoroughly discussed the sentencing statute at issue and made clear that it understood its discretion during the sentencing hearing. The court stated, "I apologize if there's a lot of law involved in this, but the law does require the court to

15

make certain findings. In rendering this sentence, I am aware of my discretion to reduce the strike enhancements for state punishment. I understand the standard and requirements of … section 1385(c)." The court then exercised that discretion by dismissing some enhancements and not others. The trial court knew, understood, and properly exercised its discretion in declining to dismiss the enhancements for each count of attempted murder.

Likewise, the record shows that the trial court weighed the risk of danger to the public when it declined to dismiss the firearm enhancements for counts 2 and 3. The parties agree that under section 1385, subdivisions (c)(2)(B) and (C), dismissal of "all enhancements beyond a single enhancement" and those enhancements that result in a sentence of over 20 years is appropriate in most cases unless there is a finding that dismissal will endanger public safety. The trial court acknowledged it would be sentencing Ramirez for more than two enhancements and these would result in punishment of over 20 years. The court also acknowledged that dismissal was required unless it concluded dismissal would endanger public safety. The trial court then found that dismissal of enhancement as to count 1 would "likely result in physical injury or other serious danger to others."

The court thoroughly explained its decision, stating that, "[b]ased on little or moderate provocation, [Ramirez] determined not only to kill his wife, but also her two innocent daughters that had nothing to do with his perceived offense. He had for years, in violation of law, kept firearms at his disposal. After leaving the house of bloodied bodies, some of which will have life-long injuries, his only thought was to empty his bank accounts, shut down the utilities, and remove the washer and dryer." The trial court also found that because Ramirez showed no remorse for actions, even two years after the

16

attempted murders, that "he is in great danger of repeating such dangerous behavior long into the future."

With respect to the court's decision to deny Ramirez's request to dismiss the firearm enhancements for counts 2 and 3, the court stated that it was adopting "the same reasoning that [it] gave for count 1, exercising the same discretion and going through the same analysis." Ramirez argues this was improper because the court was required to separately engage in further analysis of the risk of danger he posed to society with respect to these enhancements. We disagree. The statute requires the court to decide whether the dismissal of an enhancement would endanger public safety, or if it would be in the furtherance of justice to dismiss. (§ 1385, subd. (c)(1), (2).) The trial court has latitude to consider factors such as the age of the defendant and the age at which he could possibly be released. (§ 1385, subd. (c)(3), (4).) The court found Ramirez would pose a danger "long into the future." This finding was well supported by the record. The court's decision not to strike the firearm enhancements on counts 2 and 3 was a far cry from a decision that is "so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

In sum, the record shows the court was briefed by both parties on the proper application of the statute to Ramirez's sentence, was aware of its discretion, and identified and articulated sufficient factual findings concerning Ramirez's extraordinarily violent behavior to supports its decision to decline to dismiss the enhancements because Ramirez would pose a risk to public safety if released. Accordingly, reversal is not warranted here.

DISPOSITION

The judgment of conviction is affirmed.


                                           McCONNELL, P. J.

WE CONCUR:


O'ROURKE, J.


IRION, J.